## STEIN v. UNITED STATES (No. 31).[1]

1. COMMISSIONS PAID A COMMISSIONAIRE.

A commission paid a commissionaire for receiving goods, comparing with samples, procuring cases, packing and shipping these goods, is a commission simply and as such is nondutiable.

2. DURESS.

An item amongst others in an importer's invoice showing a commission had been paid a commissionaire is held to have been placed in the invoice under duress, it appearing that under the Customs Regulations the omission of this item by the importer would be followed by its immediate inclusion and further by the exaction of a penalty for its omission.

3. APPRAISEMENT.

It is not within the province or jurisdiction of this court to make a finding of the market value of imported goods.

United States Court of Customs Appeals, October 18, 1910.

TRANSFERRED from United States Circuit Court, Southern District of New York, G. A. 6742 (T. D. 28886).

[Reversed.]

*Curie, Smith & Maxwell* (*W. Wickham Smith*, of counsel) for the appellants.

*D. Frank Lloyd*, Assistant Attorney General (*William A. Robertson* on the brief), for the United States.

Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

DE VRIES, Judge, delivered the opinion of the court:

Appeal from Board of United States General Appraisers to the Circuit Court for the Southern District of New York transferred to this court:

---

[1] Reported in T. D. 31007 (19 Treas. Dec., 1059).

This is a question involving the validity of an appraisement proceeding wherein it is alleged by the importers that a commission of 2½ per cent on certain woolens and worsteds imported from Bradford and Huddersfield, England, was improperly assessed for duty. The goods were imported at the port of New York. Upon the invoices appear the notation, "Commission, 2½ per cent." Upon entry the importers first deducted the 2½ per cent commissions, and thereafter added the same, as hereafter appears.

There are three questions involved:

First: Was the 2½ per cent commission a dutiable item; or was it a plain, simple commission paid for receiving, examining, and other services not in connection with the actual market value of the merchandise?

Second. Was the inclusion, upon entry, of the 2½ per cent commission by the importers prompted by duress, and, therefore, not their voluntary act?

Third. What was the legal effect upon the subsequent proceedings, assuming the entry to have been made under duress?

The importers did not appeal to reappraisement claiming an illegal appraisement, but in due time protested.

The Board of General Appraisers found as facts:

1. That the services rendered by the commissionaire, which were assumed to be paid by the 2½ per cent, were the legitimate services of the commissionaire, and the payment for same was commissions, *which were not dutiable*.

2. That the addition made by the importer to the invoice, including such items of commissions, was voluntary, and that the collector was bound under the law to impose duty thereon.

3. That in appraising the wholesale market value the action of the appraising officer in adding the amount of the so-called commissions in the invoice was legal *so long as the appraised value did not exceed the wholesale market value of the goods*.

The importer appealed.

It appears that the principal duties of the commissionaire, for which this commission was paid, was to receive the goods after they had been manufactured and finished, unfold and compare them with the purchase samples, purchase the cases, and pack and ship the goods. Separate charges appear on the invoice for the cases and packing. The commission would seem to be a service connected with the fulfillment of the contract, rather than a performance of any of its terms. It entered into the cost of the goods to the importer but did not become a part of their actual market value. We think the record fully supports the finding of the Board of General Appraisers that the 2½ per cent was a commission, pure and simple, and in no wise entered into the actual market value of the goods. It was therefore a nondutiable item. Muser *v*. Magone (155 U. S., 240); United States *v*. Passavant (169 U. S., 16); United States *v*. Herman (91 Fed. Rep., 116); United States *v*. Kenworthy (68 Fed. Rep., 904).

Approving this finding of the board, we proceed to the consideration of the second point in the case. Was the addition of the 2½ per cent commission on the entry of the importers constrained by duress? This is really the crux of the cases.

To constitute duress in a customs proceeding, or in any other proceeding wherein duress is exercised by a public official, physical menace is unnecessary. *Moral* duress is sufficient. One of the earlier cases is Maxwell *v.* Griswold et al. (51 U. S. [10 Howard] 242). In that case the court said:

> The importer had put in his invoice the price actually paid for the goods, with charges, and proposed to enter them at the value thus fixed. But the collector concluded in that event to have them appraised, and the value would then, *by instructions and usage at New York*, be ascertained as at the time of the shipment, which was considerably higher, and would probably subject the importer not only to pay more duties, but to suffer a penalty.
>
> The importer protested against this, but in order to avoid the penalty, under such a wrong appraisal, adopted the following course:
>
> * * * "And did make an addition to his invoice, so as to escape the penalty, by means of the addition, and the payment of the consequent increased duties."

The court said further:

> We have already seen that the importer did not at first propose to enter his goods of such a value as to justify these increased duties. On the contrary, he insisted on entering them at only the price for which he purchased them, with charges, and thus agreeing with his original invoice, while the collector *virtually* insisted on having them appraised at their increased value as at the same time of the shipment, such being *the usage in the customhouse at New York, and such the requirement of the circular of the Secretary of the Treasury,* November 24, 1846. The importer, knowing that this would subject him to a severe penalty, in order to avoid it felt compelled to add to his invoice the amount which the price had risen between the purchase and the shipment.
>
> But this addition and consequent payment of the higher duties were so far from voluntary in him that he accompanied them with remonstrances against being thus coerced to do the act in order to escape a greater evil, and accompanied the payment with a protest against the legality of the course pursued toward him.
>
> Now, it can hardly be meant in this class of cases that to make a payment involuntary it should be by actual violence or any physical duress. It suffices if the payment is caused on the one part by an illegal demand and made on the other part reluctantly and in consequence of that illegality and without being able to regain possession of his property except by submitting to the payment.
>
> All these requisites existed here. *We have already decided that the demand for such an increased appraisal was illegal. The appraisal itself, as made, was illegal.* The raising of the invoice was thus caused by these illegalities in order to escape a greater burden in the penalty. * * *
>
> He was unwilling to pay either the excess of duties or the penalty and must be considered, therefore, as forced into one or the other by the collector, *colore officii,* through the invalid and illegal course pursued in having the appraisal made of the value at the wrong period, however well meant may have been the views of the collector.
>
> The money was thus obtained by a moral duress, not justified by law, and which was not submitted to by the importer, except to regain possession of his property

withheld from him on grounds manifestly wrong. *Indeed, it seems sufficient to sustain the action * * * if the duties exacted were not legal and were demanded and we:e paid under protest.*

A close study of the Maxwell case seems conclusive of all the points in this case. There is nothing in that case which indicates that there was a personal communication to the importer from the collector or any officer of the customs as to adding upon entry, which he did, and claimed was done under duress. The recited things which impelled this action upon his part are, first, the usage in the customhouse at the port of New York, and, second, a circular of the Secretary of the Treasury previously issued covering the same. The court recites in this connection:

The importer knowing that this would subject him to a severe penalty, in order to avoid it felt compelled to add to his invoice.

The remonstrance which he filed was his protest.

The court said:

The collector *virtually* insisted upon having them appraised at the increased value—

and styles this "moral duress." This virtual insistence seems to have been expressed by the usage of the port and circular of the Secretary of the Treasury..

The court goes much further in the concluding sentence of the opinion, wherein it is stated:

Indeed, it seems sufficient to sustain the action, * * * if the duties exacted were not legal and were demanded and were paid under protest.

Regardless, therefore, of the presence or absence of duress in the case, the Supreme Court in that case seems to have concluded that it is only necessary that the duties exacted be illegal, that they were demanded by the collector, and that legal protest was made. That they were demanded here seems sufficiently proven by the fact that they were paid and accepted.

It may be noted in passing that the character of the entries before us, with the additions noted, put it beyond the power of the appraiser to make any effective appraisement which would give relief to the importer, for regardless of whether the appraisement was above or below the entered value under the law the collector could not take duty at less than the entered value (customs administrative act, sec. 7). This being the case, it can not be assumed that the appraiser was further concerned in the ascertainment of a market value less than the entered value, and that this entered value, though involuntary, being before him was probably controlling in his appraisal.

What constitutes an involuntary payment made to a public official and the slight circumstances necessary in such cases to constitute involuntary payment received consideration in the case of Swift & Co. *v.* United States (111 U. S., 22). That was an internal-revenue

case. The complainants were manufacturers of matches, and the question affected an internal-revenue collection from them running over a long period of years. It was shown that the leading manufacturers of matches had made protest to the Bureau of Internal Revenue particularly against this method of computing commissions for proprietary stamps. *It did not appear that anyone in behalf of the claimant corporation, even after its organization, made any such protest, or before, until years later.* Later the claimant caused a letter to be written to the commissioner asserting its claim for the amount afterwards sued for. The commissioner, replying, denied the claim, asserting that the previous ruling would be followed. The court said:

From this statement it clearly appears that the Internal Revenue Bureau had at the beginning deliberately adopted the construction of the law upon which it acted through it successive commissioners * * *; that it refused on application prior to 1866 and subsequently to modify its decision; that all who dealt with it in purchasing these stamps were informed of its adherence to this ruling; and, finally, that conformity to it on their part was made a condition without which they would not be permitted to purchase stamps at all.

During this period of years the appellants continued doing business in pursuance of the prescribed methods of the bureau, and signed receipts, agreements, and settlements as prescribed by the bureau without further or other protest. The court further says:

* * * The question is whether the receipts, agreements, accounts, and settlements made in pursuance of that demand and necessity were voluntary in such sense as to preclude the appellant from subsequently insisting on its statutory right.

We can not hesitate to answer that question in the negative. The parties were not on equal terms. The appellant had no choice. The only alternative was to submit to an illegal exaction or discontinue its business. It was in the power of the officers of the law and could only do as they required. Money paid or other value parted with under such pressure has never been regarded as a voluntary act within the meaning of the maxim *volenti non fit injuria.*

The court then quotes many others with approval; among these is Ogden *v.* Maxwell (3 Blatchford, 319), wherein the approval noted is as follows:

* * * *It was held that illegal fees exacted by a collector, though sanctioned by a long-continued usage and practice in the office, under a mistaken construction of the statute, even when paid without protest, might be recovered back, on the ground that the payment was compulsory and not voluntary.*

And, further, the court says:

No formal protest made at the time is by statute a condition to the present right of action, as in cases of action against the collector to recover back taxes illegally exacted; and the protests spoken of * * * as having been made prior to 1866 by manufacturers of matches and others requiring such stamps are of no significance, except as a circumstance to show that *the course of dealing prescribed by the commissioner had been deliberately adopted, had been made known to those interested, and would*

*not be changed on further application,* and that consequently the business was transacted upon that footing because it was well known and perfectly understood that it could not be transacted upon any other. A rule of that character, deliberately adopted and made known and continuously acted upon, dispenses with the necessity of proving in each instance of conformity that the compliance was coerced.

Robertson *v.* Frank Brothers Co. (132 U. S., 17) was quite similar to these in many particulars. On entry the importers noted:

Shipping charges added as required by the appraiser. * * *

The same notation was made upon the invoice. The appraiser's notation was:

Value correct, with importer's additions.

The court instructed the jury as follows:

* * * If he was required to do it, or given to understand by some officer in the collector's department that it would be the worse for him, seriously, if he didn't—as, for instance, if the appraiser told him if he didn't put those on there the collector's office would, that the appraiser would, and that he would be exposed to a penalty that would be assessed against him; if he was given to understand by the collector's department, or some officer of it, that if he didn't put these figures on there they should and make it the worse for him because he didn't and he would thereby be exposed to a penalty of a larger duty which he would have to pay for not doing it, and he was in that way for the sake of saving himself from the penalty which they would put upon him beyond what would otherwise be chargeable induced to put them on, then he is not bound by it.

The jury found in favor of the importer.
The court further stated:

We do not see how the verdict can be set aside for error in the charge on this point, unless the law be that *virtual or moral* duress is insufficient to prevent a payment made under its influence from being voluntary.

* * * *In our judgment the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of that penalty might have been illegal, was sufficient to make the payment an involuntary one.* It is true that the thing done under compulsion in this case was the insertion of the additional charges upon the entries and invoices; but that necessarily involved the payment of the increased duties caused thereby, and in effect amounts to the same thing as an involuntary payment.

In the particular cases it seems that it was the practice of the customs from 1883 to 1902 not to add this $2\frac{1}{2}$ per cent to make market value on these so-called Bradford goods. About that time the Board of General Appraisers rendered a decision that these commissions were dutiable. As is well known in customs circles, the decisions of the board are promulgated throughout the trade generally and read and followed by customs brokers and importers as authority for their actions; that they are the guides as to market value and followed as authority by all collectors and appraising officers. It expressly appears in the record that this action of the board was so published and that information thereof was brought home thereby to the brokers

of these importers, and that immediately and continuously thereafter the collector and appraiser at New York followed this decision.

While the record is not clear whether or not this appellant firm was a party to the cases before the board, it is clear and undisputed that its customhouse brokers knew of these decisions, and a member of the appellant firm testified that these additions were made to prevent being assessed with penalties by virtue of said decisions.

The record contains plenary evidence that this ruling was brought home to this appellant and constrained his action with reference to these entries. They were made in November, 1903. The customhouse broker who made the entries testified:

> That from October 3, 1883, to the fall of 1902 this item of commissions was not included in the dutiable value in such entries; that it was first included about July or August, 1902, at or about which time there was a decision of the Board of General Appraisers so holding, whereupon the practice was changed.

He further stated:

> We first tried to add to it "Under duress," and the same was rejected by the collector. * * * We put the words on the slip attached to the invoice; then we had to strike off the words "Added under duress." * * * We then tried to attach a slip "Add 2½ per cent commission." * * * This was also refused. We then had a stamp made "Add 2½ per cent commission to make market value," *which we use to the present day.* These entries are invariably thrown out and we have to put a pen through the word "commission," and after that word is stricken out the entry is accepted.

Another member of the appellant's broker's firm testified:

> Question. State what has been the practice of the customhouse with regard to entries of this class of goods since these decisions where the 2½ per cent commission has not been added.
>
> Answer. To my own knowledge and from my own experience I know that the 2½ per cent commission when omitted from the entry would have been added by the United States appraisers.
>
> Question. And what would result in liquidation of duties from such an addition by the appraiser?
>
> Answer. There would be a penalty equal to the advance.

Other brokers testified to the same usage at the customhouse.

The entry clerk at the customhouse in New York substantially corroborated the testimony quoted, and justified his actions by the statement that it was held at the customhouse that the importer had no right to put words upon his entry other than those approved by law, to wit, "add to make market value," and then testified as follows:

> Question. The action taken by you or your office upon the last invoice called to your attention, in which an entry had been thrown out because the importer said "add 2½ commission under duress," the action taken by you in that case is the ordinary action that was taken and had been taken during all the time covered by these various entries in case such an entry was presented to the customhouse; is that right?

Answer. That is correct. When an entry was presented where it is stated that the addition is made under duress (it) was rejected and the importer's representative informed that it was optional with him whether he should make such addition or not.

All of the above testimony quoted, as well as that recited in this opinion concerning the usage of the New York customhouse, and the publication of the opinions of the Board of General Appraisers, and the efforts exerted by the importer's brokers to place upon their entries such a memorandum in protest of such payment as would support future action upon their part, or make proof of payment under duress by them, was presented for the first time under the old practice in the Circuit Court for the Southern District of New York, and was not before the Board of General Appraisers at the time of rendition of decision herein. This presents a vastly different record.

It is true that the collector did not insist that the 2½ per cent be added on entry, but it is equally true and fairly well established by this record that these importers knew, and there was brought home to them the knowledge, that if 2½ per cent was not added upon entry it would be upon appraisement and penalties accrue. Without quibbling upon the finer points of evidence, and coming straight to what must have been the facts of the case, as shown by the testimony, there could be no sound reason why the various classes of entries were tendered the collector except to register the importer's protest against the inclusion of this 2½ per cent as dutiable, and it was known to the importer, and his agents, that if they were not added the appraiser would add them. If this were not true, the broker and the importer were changing a policy of 20 years and performing idle acts without reason. Subsequently, and several years thereafter, to ascertain if the same practice was being observed by the collector, the importers again presented an entry to which was added their protest against adding the 2½ per cent, reciting that it was added under duress, and it was again rejected by the collector, showing that the practice was still being pursued at the customhouse. To say that the importers in these cases, in the presence of these conditions, were not constrained in their actions by the fear that unless they added on entry this 2½ per cent commission that they might be assessed in penalties, to say that they made this addition of their own free will and accord, would be to say that business men in the course of business were idly profligate of their money. We believe that it is fairly shown by the facts disclosed in this record, which differs from that before the board, that the addition put on the entries in this case, "2½ per cent commission," was induced by the fear in the minds of the importers that if they did not add upon entry it would be added by the appraiser, and that in event that decision went against them they would be assessed not only in additional duties, but in penalties. Under the decisions quoted that condition of mind inducing such plainly constitutes an involuntary act.

The language of the Supreme Court in Robertson v. Frank Bros. & Co. precisely paraphrases this situation, wherein the court said:

In our judgment the payment of money to an official, as in the present case, to avoid an onerous penalty, though the imposition of that penalty might have been illegal, was sufficient to make the payment an involuntary one. It is true that the thing done under compulsion in this case was the insertion of the additional charges upon the entries and invoices; but that necessarily involved the payment of the increased duties caused thereby, and in effect amounts to the same thing as an involuntary payment.

If the entry was an involuntary act, it was not binding upon the importers, and the commission, being a nondutiable item as found by the board, its inclusion for dutiable purposes by the collector was an illegal act subject to correction in this proceeding. United States v. Loeb (107 Fed. Rep., 692); United States v. Passavant (169 U. S., 16); United States v. Merritt (123 U. S., 356).

We now come to the third point in the case. It will be noted that the Board of General Appraisers did not expressly find the market value of the goods, but rather announced a rule of law. We are of the opinion that, it having been determined that the $2\frac{1}{2}$ per cent commission was a nondutiable item, and that its addition to the entries was induced by duress and involuntary, the case is concluded.

It is not within the province or jurisdiction of this court to make a finding of market value of imported merchandise. The law confides the ascertainment of market value to an appraiser, a single general appraiser, and a board of three general appraisers, and makes their finding of facts conclusive upon the world. Customs administrative act (sec. 13):

The only question reviewable by this court in such cases is whether or not any illegality in the proceedings of these respective officials has obtained. If so, the subsequent procedure is illegal. United States v. Loeb (107 Fed. Rep., 692); United States v. Passavant (169 U. S., 16); United States v. Merritt (123 U. S., 356).

If the entries in these cases were not the free will of the importer, but involuntary, they were illegal entries and were not binding upon the importer. Maxwell v. Griswold (51 U. S., 242); Robertson v. Frank Bros. & Co. (132 U. S., 17).

While there is no express declaration in the statutes as to the order of proceedings in customs administration, the whole framework of the statutes and regulations made thereunder are constructed upon the principle that entry must precede appraisement. By entry, which is made under oath and must be accompanied by the invoice or substituted invoice, or a bond to produce the same, the importer gains possession of his merchandise from the collector, taking it out of the possession of the Government into his own. Until entry is made, and unless made within a stipulated time, the collector is compelled under

the law to retain in his possession all of the merchandise. Upon the making of entry and filing of the bond all of the merchandise except required samples is released to the importer. That this has been the theory upon which the Government has proceeded for 30 years at least is shown by T. D. 4788, wherein the Assistant Secretary of the Treasury expressly declared that there could be no appraisement before entry. Moreover, that this was the assumption of the Congress is shown by section 2928 of the Revised Statutes, wherein in specified cases express authority is deemed necessary and given that appraisement may be had before entry. (See also T. D. 15631.)

By the Treasury Regulations of 1899, article 410, and section 7 of the customs administrative act of 1890, it is declared that the collector shall direct the appraiser to make appraisement. It is expressly declared in these regulations that to that end the collector shall select certain packages, designating the number and method of selection, and send them, with the invoice, *upon which shall be noted by the collector the entered value* of the merchandise, *"for the information of the appraiser."*

That regulation, which was in effect during the importations covered by this case, is as follows:

ART. 410. Every invoice, as soon as entered, shall be stamped with the date of the entry and certified by the signature of the collector or his deputy. * * *

The rates of duty charged upon entry and *the entered value shall be duly stated on the invoice for the information of the appraisers.* * * *

The collector shall then transmit all the papers to the naval officer, who shall * * * check the invoice, entry, and permit, if found correct, and, retaining the duplicate entry, return the original and other papers to the collector, who will promptly *transmit the invoice to the appraiser.*

This regulation transcends no law, is fully authorized by the general statute directing the Secretary of the Treasury to make rules and regulations affecting the appraisement of merchandise. (R. S., 2949.)

There is no discretion, under the regulations, allowed the collector in this behalf, and it is mandatorily required that whenever he shal call for an appraisement he shall forward to the appraiser not only the samples of the merchandise but the entered value thereof stamped upon the invoice for his consideration in determining the market value of the merchandise.

In innumerable cases from the commencement of the Government to date it has been uniformly held that there could be no valid appraisement without samples before the appraiser.

Not alone this, but the appraising officers must proceed in the examination of these samples as required by law and the regulations, and any deviation therefrom would result in an invalid appraisement. Converse *v.* Burgess (59 U. S., 413 [18 How.]); United States *v.* Passavant (169 U. S., 16).

By a parity of reasoning we are unable to conceive how there could be a valid appraisement when the entered value of the merchandise is either not or is improperly indorsed upon the invoice, for that is one of the matters which the collector must certify to the appraiser for his information in arriving at actual market value. If the entered value certified to the appraising officer is one which is obtained through duress and involuntary and does not represent the opinion of the importer nor indicate his true estimate of the value of the merchandise, we see no escape from the conclusion that the regulations have not been complied with in the appraisement of such merchandise, and, not having been complied with, the appraisement is an invalid one.

The principle is precisely stated in United States v. Passavant (169 U. S., 16), wherein the court states:

* * * While the general rule is that the valuation is conclusive upon all parties, nevertheless the appraisement is subject to be impeached where the appraiser or collector has proceeded on a wrong principle contrary to law or has transcended the powers conferred by statute. Oberteuffer v. Robertson (116 U. S., 499); Badger v. Cusimano (130 U. S., 39); Robertson v. Frank Brothers Company (132 U. S., 17); Erhardt v. Schroeder (155. U. S., 124); Muser v. Magone (155 U. S., 240).

Indeed, in the case of Maxwell v. Griswold et al. (51 U. S. [10 How.], 242), previously quoted, the Supreme Court in a case on all fours with this, where the illegality under consideration was duress in the making of the entry, stated concerning the appraisal as follows:

* * * We have already decided that the demand for such an increased appraisal was illegal. *The appraisal itself, as made, was illegal.*

And the same pronouncement is made by the Supreme Court in the case of Robertson v. Frank Brothers & Co. (132 U. S., 17), quoted supra, wherein the addition was made to one of the entries in apprehension of the imposition of added duties and penalties; the court pronounced this such a divergence from the prescribed procedure as to render the proceeding illegal.

While it is urged by counsel for the Government that any irregularities were corrected by the character of the notation made by the appraiser in his certificate of appraisement, the notation in the Robertson v. Frank Brothers & Co. case was almost identical in language. The notations in these cases were as follows:

Full foreign market value is covered by entered value, which includes item X.
The item on the invoice marked "X" is "Commission 2½ per cent."
The importers' addition noted. Full foreign market value will not be covered with "commission" deducted.

The notation in Robertson v. Frank Brothers & Co. case was: "Value correct, with importer's additions."

In our view of the case, having held that the entry was an involuntary one, the proceedings thereafter were vitiated, and hence, however

regular may have been the proceedings of the appraiser in other respects, they were, for the reasons stated, invalid.

The only value of a reference to these notations made by the appraiser in his certificate of appraisement is to confirm the logic of the conclusions hereinbefore reached in that they show the certification by the collector to the appraiser of the entered value forms, and did, particularly in these cases, form the basis going to make up the judgment and decision of the appraiser as to the true market value of the goods, and that, this being an involuntary value, the collector failed in affording the appraiser correct information upon this point. Having so failed, contrary to the regulations in such case made and provided, we think the appraisement was invalid.

The collector should take duty upon the invoice value, it having been determined by the Board of General Appraisers that the 2½ per cent commission upon these invoices was not a dutiable item, and that determination having been approved by this court, it is the duty of the collector to proceed to liquidation without including this commission as a dutiable item in these particular cases. The decision of the Board of General Appraisers is reversed.