UNITED STATES *v.* ALFRED KOHLBERG, INC. (No. 4245) [1]

United States Court of Customs and Patent Appeals, January 4, 1940

*Webster J. Oliver*, Assistant Attorney General (*Samuel D. Spector*, special attorney, of counsel), for the United States.

*Lane & Wallace* (*William Young* of counsel) for appellee.

[Oral argument December 6, 1939, by Mr. Spector and Mr. Young]

[1] C. A. D. 88.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court, Third Division, in two reappraisement proceedings which, because of their identity in principle, were consolidated for trial. The reappraisements are numbered, respectively, 112074–A and 112408–A. The merchandise involved in 112074–A consisted of handkerchiefs which were exported to this country from Swatow, China, in November 1935; that in 112408–A consisted of bedspreads exported from Shanghai, China, in December 1935.

In both instances it was agreed before the respective tribunals of the Customs Court, and it is agreed before us, that export values (as the term "export value" is defined in section 402 (d) of the Tariff Act of 1930) are the proper dutiable values.

In the case involving handkerchiefs, the merchandise was entered by the importer at the invoice unit values, less 3 per centum plus packing; in the case involving bedspreads, entry was made at the invoice unit values, less 2 per centum plus packing. The local appraiser appraised the merchandise at the unit invoice values plus packing, disallowing the 3 per centum and 2 per centum discounts, respectively claimed by the importer as cash discounts.

The importer appealed for reappraisements; the single judge sustained the entered values and, upon appeal by the Government, his judgment was affirmed by the appellate division. The Government then took the instant appeal to this court.

The following findings of fact were made by the appellate division:

The importers of these materials purchase [d] in China through commissionaries or compradores, who finance or guarantee all business, or through so-called Number One Chinamen, who guarantee delivery. In buying the merchandise certain commissions are charged the American importers by these commission merchants whom we will call buying agents. The foreign sellers of the merchandise uniformly grant discounts for cash. In the Swatow district the discounts range from 3 to 5 per centum, while in the Shanghai district only 2 per centum for cash is allowed. However, it is seldom that these discounts inure directly to the benefit of the American purchaser. In fact the American purchaser pays his buying agent in China the *per se* price of the merchandise as invoiced. The proceeds derived from the discount obtained from the sellers of the merchandise are retained in the office of the purchaser's agent in China, where it is sometimes distributed in whole or in part as a sort of bonus to certain employees. The reason for this is that when merchandise arrives in the establishment of the purchasing agent it is inspected and all defective goods are rejected. Also other services beneficial to the American purchaser are rendered. It further appears that the sellers are always desirous of obtaining cash upon delivery of the merchandise and the buyer's agent advances the money on behalf of his principal. The evidence adduced by the importer as well as the reports of the special agent, introduced by the Government, are clear upon the point that the Chinese sellers uniformly allow a 2 per centum discount in the Shanghai market and discounts

of from 3 to 5 per centum in the Swatow market, although none of the sellers will quote a price without knowing what discount will be expected by the purchaser. The special agent also reported instances where the American buyers maintain their own purchasing offices in China, receive the regular discounts from the sellers and that such discounts inure entirely to the benefit of the purchasing firms.

Upon the basis of the facts so found, the judgment was predicated.

The contentions on behalf of the Government before us are summarized in its brief as follows:

(1) That the appraised value was the correct dutiable value because there was no evidence that *all* purchasers who buy in usual wholesale quantities and in the ordinary course of trade at unit invoice values receive a discount of 2% on merchandise purchased in Shanghai, and 3 per cent on merchandise purchased in Swatow.

(2) That the importer has not proven by competent evidence, the elements required by law of an appealing party.

(3) That in order for an importer to be allowed a discount, he must establish by competent evidence, that he received the benefit of the said discount.

(4) That the alleged discounts of 2 and 3 per cent, were buying commissions, or allowed because of other considerations and therefore dutiable items.

Obviously, the first of these contentions presents a question of fact, that is, whether all purchasers who buy in usual wholesale quantities in the ordinary course of trade receive the respective so-called discounts mentioned. The tribunals of the Customs Court concurred in the finding that all purchasers did receive such discounts. That finding as a finding of fact is conclusive so far as this court is concerned unless we should find as a matter of law that there is no substantial evidence to support it. It is perfectly evident to us that there is substantial evidence to support it. The importer in this case presented much evidence covering this point, and the report of the special agent of the United States Treasury Department introduced by the Government corroborates it.

It is true, particularly in the Swatow market, different purchasers seem to have been allowed different percentages of discount, but as to this we deem it proper to say that the record indicates that in most instances the discounts were as high as 5 per centum. Appellant here claims only 3 per centum with respect to the goods exported from that market. The record shows that there are different methods of dealing in merchandise of the types here involved in China. Some purchasers maintain their own offices there and buy directly without the interposition of a Chinese purchasing agent or a so-called Chinese "No. 1 Boy." Other purchasers employ a commissionaire to do the purchasing and do not use the "No. 1 Boy." Still others, as was the case with the importer here to whom, it appears from the report of the special Treasury agent, the alleged discounts were "actually passed on," have the services of both a purchasing agent and a "No. 1 Boy." In those reports it may be said that there is not uniformity in the

methods of purchasing, but this does not affect the ultimate fact that all purchasers, whatever may be their methods of buying, are allowed so-called discounts.

We have referred to the allowances as "so-called discounts" because of certain contentions respecting their nature made by counsel for the Government. Briefly, they contend, in effect, that the Chinese "No. 1 Boys" are in reality agents of the seller of the merchandise and that in the instances where they act and receive the 2 per centum and 3 per centum allowances, such allowances are "buying commissions" and the purchaser does not receive the benefit of them, it being insisted that unless the purchaser himself receives such benefit he is not entitled to claim deductions of the allowance from the dutiable value.

We do not regard these contentions as sound.

In the first place, as is stated in the decision of the appellate division, there is nothing in the record to indicate that the commission-aires and buying agents act as brokers on behalf of the sellers. That is merely an assumption which the Government urges should be drawn from what does appear as to the different methods of doing business which is shown. It is shown, as found by the appellate division, that these "No. 1 Boys" inspect the merchandise after it is received from the seller, return any goods which may be rejected and, where necessary, launder the merchandise and repack it. We agree with the appellate division that these activities do not operate to put these persons in the position of acting for the seller of the goods.

Another contention on behalf of the Government is that those services were rendered in placing the merchandise in condition ready for shipment to the United States and hence that the compensation paid out of the discounts was a part of the expenses which the statute provides shall be included in the dutiable value, or, in other words, that those commissions constitute, in effect, a part of the market value defined by the statute. We find nothing in the record which, in our opinion, would have justified the appraising tribunals in finding this as a fact. The contention seems to have been presented before the appellate division and obviously the whole trend of its decision is contrary thereto.

It is pointed out in the decision of the appellate division that this court in the case of *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T. D. 31007, held that a commission paid by an importer to a commissionaire to receive goods, unfold and compare them with samples, procure cases and attend to the packing and shipping of the same, entered into the cost of the goods to the importer, but did not become a part of the market value of the goods, and the charge

for such service was simply a commission and constituted a non-dutiable item.

The appellate division also said:

Even while commissions paid by a seller to his agent are ordinarily a part of the selling price of goods, when it is shown that the buyer could buy direct from the seller without the intervention of an agent, but chose to buy through the agent, to whom he had to pay 3 per centum added by the exporter, such commission constitutes no part of the export value. See *United States* v. *Enrique Vidal Sanchez*, 15 Ct. Cust. Appls. 443, T. D. 42642. In *United States* v. *Case*, 13 Ct. Cust. Appls. 122, T. D. 40958, compensation paid to an agent of the importer for his services in buying material and furnishing it to Chinese makers of lace, and also for his services in supervising the work and collecting it when finished, was held to be a commission and no part of the market value.

In the case of *Western Sausage & Provision Co., Inc.,* v. *United States,* Reap. Dec. 2049, it was held that the market value of merchandise upon which a cash discount was allowed is the price less such cash discount, notwithstanding that cash was not paid, nor any cash discount actually allowed. The Supreme Court in *Arthur* v. *Goddard,* 96 U. S. 145, 24 L. ed. 814, held that where goods were sold for a certain sum less 2 per centum cash discount, and the net price represented the foreign-market value of such goods, the net price was the dutiable value, notwithstanding that the cash discount was not actually allowed.

We do not deem it necessary to discuss in detail all the *arguments* presented by the Government. Its contentions have been stated above in the language of its own summary.

The record here is quite an elaborate one, much more elaborate than is usual in reappraisement proceedings which reach this court. The cases have been well tried and they were thoroughly discussed in the decisions below.

It is our conclusion that there is substantial evidence to support the findings of fact made by those tribunals who alone are charged with the responsibility of finding facts, and that no errors of law were committed.

The judgment of the United States Customs Court is *affirmed.*