(Reap. Dec. 8162)

NEW YORK MERCHANDISE CO., INC. *v.* UNITED STATES

Entry No. 760157.

(Decided September 15, 1952)

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Chauncey E. Wilowski*, special attorney), for the defendant.

OLIVER, Chief Judge: This appeal for reappraisement involves the valuation of certain decorated earthenware and porcelain dolls exported from Japan in April 1941.

This case presents a redetermination of a question previously decided by this court in *New York Merchandise Co., Inc.* v. *United States*, 19 Cust. Ct. 214, Reap. Dec. 7334. The record in that case has been incorporated herein and additional evidence has been introduced by the defendant. The decision in the incorporated case established the proper basis of valuation to be the export value, as defined

in section 402 (d), Tariff Act of 1930, and that such value was the appraised value, less the buying commission. Here, the only question raised is whether or not, upon this new record, the items invoiced as buying commissions are nondutiable items that should be deducted in arriving at the export value. On entry, certain items invoiced as buying commissions were deducted by the importer as nondutiable charges. The appraiser reported values per gross, net packed, the effect of which was to disallow the deductions of the buying commissions.

The plaintiff contends that the items invoiced as buying commissions are nondutiable items and that the export values of the merchandise are represented by the entered values. The defendant, on the other hand, maintains that the items described as buying commissions are properly a part of the value of the goods.

The testimony in the incorporated case established that the plaintiff therein had entered into a contract with Strong & Co., the shipper of the merchandise there under consideration (plaintiff's exhibit 1 in reappraisement 144622–A), whereby the latter firm was to act for the plaintiff as its agent in Japan and perform the services for which it was to be paid a commission. One of plaintiff's witnesses, a buyer for the importer, testified that he visited Japan and, with a representative from Strong & Co., visited many of the manufacturers of the type of merchandise involved, examined samples, conferred with the manufacturers about prices and quantities, and initiated negotiations for purchases. The particular merchandise there under consideration was purchased from various manufacturers in Japan on reorder by cables to Strong & Co. who paid the manufacturers for the goods, invoiced them to the plaintiff, and then drew on the importer for the money. It also appeared that Strong & Co. provided the plaintiff therein with an office in Japan where books and records were kept and business transacted. The agent also checked the progress of the manufacturer and the time of delivery of the merchandise. Ultimately, the goods were delivered to the warehouses of Strong & Co. where they were inspected, checked for size and quantity, and compared with samples. Strong & Co. also prepared the merchandise for shipment, arranged for shipping space, and shipped the goods to the plaintiff. For the above services, a commission was paid by the plaintiff to Strong & Co.

There were also introduced in evidence in the incorporated case two reports of Treasury attachés outlining the circumstances surrounding the exportation of merchandise such as that here in question. Defendant's exhibit A in the incorporated case (reappraisement 144622–A) is one of these reports and covers shipments from Japan of fiber manufactures. It indicates that such merchandise could not have been purchased for export to the United States except through a

resident purchaser in Japan. Further reference therein was made to the "Control over Exports of Japanese Merchandise" as exercised by the Nippon Foreign Trade Promotion Company over sundry goods and the Fibre Manufactures Export Promotion Company over practically all fiber manufactures with the exception of piece goods.

Defendent's exhibit B in the incorporated case is the other report, referred to above, and describes the control over exports of Japanese merchandise by certain governmental "organs" designated as promotion companies. Attached to this report is a copy of a letter received from The Nippon Boeki Shinko Kaisya, Ltd. (The Japan Foreign Trade Promotion Co., Ltd.), one of the governmental "organs" in question, wherein the regulations governing purchases, sales, and consignments of exports are set forth. The objects of this company's business are indicated as follows:

(1) Preventing the imported materials solely intended for manufacturing goods for export being used for home consumption.

(2) Improving, and checking the degradation of, the quality of the goods for export.

(3) Preventing dumping or unfair selling competition, * * *.

This report further states that the merchandise subject to the company's regulations "shall not be, until otherwise ordered, applicable to exports, or purchases for export to the United States," and also are not to be "considered to prevent free and open negotiations between exporters to the United States and manufacturers." A second letter attached to this report from another of the promotion companies is of the same tenor, and likewise indicates "that in so far as the United States market is concerned, those provisions of the regulations of our company which would close or preclude a free and open market * * * shall not be, until otherwise ordered, applicable to exports or purchases for export thereto."

The record in the incorporated case has been supplemented by the introduction in evidence of three reports of Treasury attachés. Defendent's exhibit 1 in the case at bar, dated September 11, 1941, is identical with defendent's exhibit A in the incorporated case. Defendent's exhibit 2 and defendant's exhibit 3, dated February 17, 1941, and February 26, 1941, respectively, cover substantially the same subject matter which had been summarized in defendant's exhibit B in the incorporated case relative to the control over exports of Japanese merchandise as exercised by certain governmental "organs" charged with the control over exports of sundry goods.

Defendent's exhibit 2 indicates the method of control and its operation as follows: (1) All orders from abroad must be registered with the control company; (2) if the order is approved, the shipper may place the same with a manufacturer; (3) the manufacturer may then secure the raw materials from which the goods are to be manufactured; (4)

the goods must be delivered by the manufacturer to the exporter through the company—actual physical delivery may not be required, but permission must be given by the company; (5) terms of sale, selling prices, etc., must be approved by the company. This exhibit states:

Up to the present, it is our understanding that transactions have proceeded much as in the past, with an exporter placing his order with the manufacturer and merely recording the transaction with the control company. However, it is planned for the various control companies to actually purchase the goods from the manufacturers and sell them to exporters. This new scheme will, if it becomes operative to all, probably not come into effect with all the control companies on the same date or in the same manner.

\* \* \* \* \* \* \*

The whole scheme is in a rather nebulous state at this writing, and there is much uncertainty and confusion among shippers and makers as to what actually is intended, which uncertainty and confusion appears to be shared by the officials of the control organs themselves.

Defendant's exhibit 3, dated February 26, 1941, is a further report relative to the formation of the control companies and their functions as heretofore indicated in defendant's exhibit 2. It appears, however, that the methods of operation of all control companies which were to be formed were to be substantially the same.

Many of the statements made in the above reports respecting the conditions surrounding the exportation of Japanese merchandise are supposititious, and the reports lack sufficient factual evidence upon which a determination of value can be made. One of the invoices here involved specifies a shipment of decorated earthenware dolls from Shibuya Shoten of Moriyama-cho, Aichi-Ken, Japan. The invoice also bears a rubber-stamp facsimile reading "Japan Pottery Exporters Assn., Nagoya Office, Mar. 27, 1941." Nowhere in this record is this association identified. Neither have its functions been explained nor has it been mentioned in any of the exhibits introduced in evidence by the defendant. Accordingly, there is no way of knowing whether or not this particular association was a control company or what its functions were, or their possible effect on the value of this merchandise on the day of exportation.

Compensation paid to an agent of an importer for services in buying material, receiving goods after they have been manufactured and finished, comparing them with the samples, procuring cases, and attending to the packing and shipping is a buying commission and, as such, is a nondutiable charge. *William Krocker* v. *United States*, 25 Cust. Ct. 351, Reap. Dec. 7847; *Stein* v. *United States*, 1 Ct. Cust. Appls. 36, T. D. 31007; *United States* v. *Case & Co., Inc.*, 13 Ct. Cust. Appls. 122, T. D. 40958.

In the case at bar, there is substantial evidence in the record to support a finding that Strong & Co. was the buying agent of the plaintiff herein, and, for services rendered, was paid a commission.

Defendant's exhibit 1 states that membership in the exporters' association was open to any *bona fide* exporter or shipper resident in Japan. It would seem that, had the plaintiff desired to do so, it could have maintained a foreign office in Japan, and its resident manager then could have been a member of the association and in that capacity purchased the merchandise directly from the manufacturers. In lieu of such an arrangement, however, the plaintiff chose to employ a resident commissionaire, Strong & Co., as its buying agent and for services so rendered paid it a commission.

The situation that prevailed in the purchase of goods exported from Japan at the time of exportation of the involved merchandise appears to be summed up in the report of the Treasury attaché in his letter of April 4, 1941 (defendant's exhibit B, reappraisement 144622–A), wherein it is stated:

\* \* \* So far as we can ascertain from the trade, the situation at present is that such merchandise can be freely sold for export to the United States except for the red tape involved and the payment of the control fees.

In the present case, the question of the control fees is not in issue.

So far as proof tending to establish market value of the merchandise here in question is concerned, I find nothing of substance in the additional reports introduced herein different from that considered by the court in the incorporated case.

On the entire record, I find that the proper basis for the determination of the value of this merchandise is the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930; that the items of commission of 6 per centum, as added by the appraiser, represent no part of the export values; and that the appraised values, less the items of 6 per centum commission, represent such export values.

Judgment will be rendered accordingly.